Keeley Tatsuyo HUNTER, a minor, by Gina F. BRANDT, her mother and next friend, Plaintiff–Appellant,

v.

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, and Theodore R. Mitchell, Defendants–Appellees.

No. 97–55920.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 1, 1999.

Decided Sept. 9, 1999.

James K.T. Hunter, Los Angeles, California, and Mark T. Gallagher, Sacramento, California, for the plaintiff-appellant.

Dennis M. Perluss, Los Angeles, California, for the defendants-appellees.

Before: PREGERSON, BEEZER, and HAWKINS, Circuit Judges.

Opinion by Judge PREGERSON; Dissent by Judge BEEZER.

PREGERSON, Circuit Judge:

## I.

This case is about an elementary school operated as a research laboratory by UCLA's Graduate School of Education and Information Studies. The Corinne A. Seeds University Elementary School ("UES"), and its research and training mission is to help the State of California meet the needs of a dramatically changing public school population. To this end, UES identifies issues relevant to the education and social development of children in multicultural, urban communities, conducts research on these issues, and develops innovations in teaching based on this research. UES shares its research results with public school teachers throughout the State of California through seminars, workshops, teacher training programs, and published articles.

Each year, UES's Admissions Committee, under the direction of the Dean of the Graduate School of Education and Information Studies and the Director of UES, determines what characteristics are needed in UES's 460–student population to fulfill its research and training mission. UES considers gender, race/ethnicity, and family income in its admissions process to obtain the desired student population. In selecting students, UES also considers other factors that might affect a child's suitability as a research subject, e.g., dominant language, permanence of residence, and parents' willingness to comply with UES's mandatory involvement requirement. Parents of students applying to UES are informed of UES's consideration of race/ethnicity, gender, and family income in admissions.

Richard Hunter and Gina Brandt's older daughter Cia was admitted into UES through its admissions process. Apparently pleased with Cia's experience at UES, in 1995, the year after Cia graduated, they sought to enroll their younger daughter, Keeley. Keeley was not selected for admission.[1] When notified that their daughter had not been admitted, Keeley's parents sued the Regents of the University of California ("Regents") under Title VI of the Civil Rights Act of 1964, 42 U.S.C. section 2000d, and Dr. Theodore Mitchell, Dean of the Graduate School of Education and Information Studies, under 42 U.S.C. section 1983.[2] The suit challenges the constitutionality of UES's admissions process.

The district court conducted extensive hearings on the school's purpose, its research, and its admission process, and ultimately ruled in its favor. The district court found that (1) California had a compelling state interest in operating a research-oriented elementary school dedicated to improving the quality of education in urban public schools, and (2) UES's consideration of race/ethnicity in its admissions process was narrowly tailored to further that interest. We affirm.

## II.

The Equal Protection Clause of the Fourteenth Amendment prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Supreme Court has said that "any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Adarand Constructors, Inc., v. Pena,* 515

U.S. 200, 224, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). To meet the strict scrutiny test, the Regents must demonstrate that UES's consideration of race/ethnicity is *narrowly tailored* to serve a *compelling governmental interest. See id.* at 227, 115 S.Ct. 2097.

■ The district court's conclusion that UES's admissions procedures meet the strict scrutiny test is based on extensive findings of fact which we review for clear error. *See National Ass'n of Radiation Survivors v. Derwinski,* 994 F.2d 583, 587 (9th Cir.1993). After reviewing the entire record, we conclude that Judge Kenyon's findings of fact were not clearly erroneous.

■ The district court's conclusions regarding the sufficiency of those facts in meeting strict scrutiny is a mixed question of law and fact which we review de novo. *See id.* We conclude, as did the district court, that the facts demonstrate that the defendants have met the strict scrutiny test.

## III.

■ In applying the strict scrutiny test to UES's use of race/ethnicity as a factor in its admissions process, we first consider whether California's interest in the operation of a research-oriented elementary school dedicated to improving the quality of education in urban public schools is a *compelling state interest.*[3]

"[E]ducation is perhaps the most important function of state and local governments." *Brown v. Board of Education,* 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954). The Supreme Court has recognized " 'the public schools as a most vital civic institution for the preservation of a democratic system of government.' " *Plyler v. Doe,* 457 U.S. 202, 221, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (quoting *School*

1. There is no suggestion that any different admission procedures were employed in the process resulting in Keeley's rejection than in Cia's earlier acceptance.

2. Keeley was four years old when the suit was initiated. Gina Brandt brought the suit as

Keeley's "mother and next friend," and Keeley is represented by her father, Richard Hunter, attorney at law.

3. The parties agree that UES's admission's process is *not* part of a remedial program.

*Dist. of Abington Township v. Schempp,* 374 U.S. 203, 230, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring)); *see also Wisconsin v. Yoder,* 406 U.S. 205, 213, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) ("Providing public schools ranks at the very apex of the function of a State.").

The district court heard extensive expert testimony on current problems in public urban education. The challenges posed by California's increasingly diverse population intensify the state's interest in improving urban public schools. Cultural and economic differences in the classroom pose special problems for public school teachers. In his decision, Judge Kenyon noted that defendants presented "an unexhaustive list of such issues and challenges [that] includes limited language proficiency, different learning styles, involvement of parents from diverse cultures with different expectations and values, and racial and ethnic conflict among families and children." Dr. Mitchell,[4] who testified as an expert witness, stated that "[t]here is no more pressing problem facing California, or indeed the nation, than urban education; for it is in the urban school system that the majority of California's future citizens will be educated (either well or poorly), creating the basic fabric for the society of the future."

UES is dedicated to providing more useful and more accurate information to educators facing these challenges. Dr. Deborah Stipek,[5] director of UES, testified, "[t]he current mission of UES is to do research relevant to ... urban education and to disseminate that research to promote more effective education for children in urban schools." As part of its research mission, UES exchanges information with the State Department of Education as well as other California educational policy groups; trains teachers; develops and tests innovative teaching strategies; and disseminates study results nationwide.

Dr. Mitchell also testified that "[t]he dynamic interplay of ... research, dissemination, professional development, and the training of an ever-expanding cadre of researchers dedicated to find[ing] the answers to the perplexing problems facing urban schools ... makes UES a unique and powerful instrument in meeting the State's fundamental obligations to the children of its cities."

■ Given this record, the district court concluded, and we agree, that "the defendants' interest in operating a research-oriented elementary school is compelling."[6]

4. The district court accepted each of the defendants' witnesses as an expert in their field. Dr. Mitchell received a Ph.D. from Stanford University in 1983. He served as chair to Dartmouth's Department of Education, and Deputy to the President of Stanford University before becoming Dean of UCLA's Graduate School of Education in 1992. He has published numerous scholarly articles on education and school reform.

5. Dr. Stipek also testified as an expert witness. She received a Ph.D. in developmental psychology from Yale University. She has published numerous articles on early childhood and elementary education. She has been with the Graduate School of Education and Information Studies since 1977.

6. The appellant argues that only an interest in remedying past discrimination can justify UES use of race/ethnicity as one of a number of factors in its admissions process. We disagree. The Supreme Court has never held

that only a state's interest in remedial action can meet strict scrutiny. In fact, in *Miller v. Johnson,* 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995), the Court expressly left open the question whether "compliance with the [Voting Rights] Act, *standing alone,* can provide a compelling interest *independent of any interest in remedying past discrimination.*" *Id.* at 921, 115 S.Ct. 2475 (emphasis added). The Court in *Shaw v. Hunt* followed *Miller* and left this question open: "In *Miller,* we expressly left open the question whether under the proper circumstances compliance with the Voting Rights Act, on its own, could be a compelling interest. Here once again we do not reach that question...." *Shaw v. Hunt,* 517 U.S. 899, 911, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) (internal citation and parenthetical omitted).

In addition, contrary to the dissent's assertion, this court has *not* "held that '[r]ace based classifications must be reserved strictly for remedial settings.'" *Infra* at 1071 (quot-

The dissent expresses some concern that, as a result of our decision, "every stratum of a state's public education system (whether formally designated a 'laboratory school' or not) may now in the name of 'research on effective educational strategies' implement a racially classified admission system." *Infra* at 1075. We do not share this concern.

It is not UES's *designation* as a laboratory school that justifies its admission process. UES's status as a laboratory school with a research mission is not a designation without substance. UES's research is funded in part through federal and private grants and its students are protected by all federal, state, and university guidelines, rules, and policies pertaining to research involving human subjects. Research results are shared through "a variety of publications, the television and film industries, computer technologies, and other media," as well as through "seminars, workshops, observation opportunities, and conferences" offered to teachers, administrators, researchers, and educational policy makers. Its research mission and its dissemination of information makes UES "a center for the education and training of teachers and educational leaders." Through UES, "nationally recognized scholars work together with educators and administrators to foster a better schooling system for California children."

Nor does UES's *stated mission* of "educational research" justify its admissions process. A mere statement from a governmental entity that it is committed to research, without more, would not be sufficient to establish a compelling interest. But research is fundamental to the UES's charter. The research mission affects the day-to day experience of its students and requires more resources than those available to most, if not all, other elementary schools. In 1995, UES's elementary school, with its population of 460 students, had a faculty of twenty-seven professors with doctorates in fields including psychology, education, and medicine. In addition, twenty-one graduate, doctoral, and post-doctoral students, three medical students, thirty-two nursing students, and seventy-five undergraduate student teachers were involved with the elementary school, observing, working with students, and conducting research.

All of these characteristics make UES an exceptional school and a valuable resource to California's public education system. Consequently, we do not share the dissent's concerns that this decision will lead to racial classification in "every stratum of a state's public education system." *Infra* at 1075.

## IV.

■ To complete our strict scrutiny analysis, we next address the question whether the district court correctly concluded that "[t]he defendants have successfully proven that the use of racial and ethnic identity criteria in UES's admission policy is *narrowly tailored* to serve the purpose of a compelling state interest." (Emphasis added.) In support of this conclusion, the district court pointed to "a parade of experts [who testified] about the necessity of a race-conscious admission policy at UES. Each expert's testimony was underscored by the belief that the State must 'continue to conduct research on issues involving how children learn and how we can do a better job of teaching

ing *Coral Construction v. King County*, 941 F.2d 910, 920 (1991)). Rather, this court held that where the asserted state interest *is* remedying past discrimination, this remedial interest must be supported by concrete evidence of discrimination. *See id; see also Monterey Mechanical v. Wilson*, 125 F.3d 702, 714 (9th Cir.1997) (same). In *Coral* and *Monterey*, this court simply followed the Supreme Court's decision in *City of Richmond v.*

*J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), which required a "strong basis in evidence" for race-based remedial action. These holdings have no bearing on the question whether a non-remedial interest, such as the operation of a research-oriented elementary school dedicated to improving the quality of education in urban public schools, can serve as a compelling interest sufficient to survive strict scrutiny.

them.'" (quoting Dr. Harry Handler's [7] testimony).

Dr. Carollee Howes [8] testified that "[t]here is a simple rule about being a researcher. . . . If you're trying to find a sample that has some [particular] distribution of race, you use race as the variable to make that. You don't use an approximation or some variable of it." Dr. Stipek further testified that "even if the applicant pool in the aggregate [was] sufficiently diverse, an entirely random selection would not yield a population that balances ethnicity with other factors, such as age, gender and family income." Dr. Handler also testified that "[b]ecause of the small sample size, it is highly unlikely that such a small group, if selected without some explicit consideration of race/ethnicity, would be representative of Los Angeles' or the State's urban school population." [9]

The district court commented on the testimony presented:

> The Court simply cannot hope to recount each of the particular innovative educational techniques developed at UES, or each of the specific studies conducted at UES, which rely on the diversity of the laboratory school's student population. Having examined the testimony of the defendants' witnesses, the Court is convinced that without a racially and ethnically diverse student

population, the benefits to be gained by these innovations and studies would be lost.

Accordingly, the district court concluded that "it would not be possible, nor would it be reasonable, to require the defendants to attempt to obtain an ethnically diverse representative sample of students without the use of specific racial targets and classifications."

The dissent suggests a number of alternatives to UES's current admissions process. These alternatives range from locating laboratory schools elsewhere to mandating laboratory conditions in public schools throughout California. *See infra* at 1077. But both Dr. Stipek and Dr. Handler testified that it was necessary to explicitly consider race/ethnicity in UES's admissions process to achieve the precise student population required for UES's research.[10] Therefore, even if California were to establish one or more other lab schools elsewhere, this would not address *UES's* need to maintain the representative sample of students UES needs to fulfill its research mission.

Finally, in evaluating whether UES's use of race/ethnicity in its admissions process is narrowly tailored, we recognize, as did the district court, that courts should defer to researchers' decisions about what they need for their research.[11] The Su-

---

7. Dr. Harry Handler has a Ph.D. in Educational Psychology from the University of Southern California, and, at the time of his testimony, was Adjunct Professor and Special Assistant to the Graduate School of Education and Information Studies. Dr. Handler was Superintendent of the Los Angeles Unified School District for seven years.

8. Dr. Howes has a master's degree in child study from Tufts University, a Ph.D. in developmental psychology from Boston University, and post-doctoral training in social psychiatry at Harvard University. Dr. Howes has published books, treatises and studies in her field including a series on child care policy studies.

9. In 1995, there were 46 students admitted to the Early Childhood Program. Consequently, each child made up 2.2% of the class.

10. "We cannot have a subject sample that does not have meaningful distribution of eth-

nicity and still meets the scientific standards that we are held to. . . . Otherwise, you can't do research there." Dr. Stipek's Trial Testimony for April 9, 1997.

11. No one would challenge a decision of UCLA medical school to explicitly consider ethnicity in selecting study participants for research on *Gauchers* disease or Tay–Sachs– diseases that occur predominantly in the Jewish population. Nor would anyone have a problem with a study on the effects of nutrition in the prevention of sickle-cell anemia that limited study participants to Black children. Nor would anyone object to a similar study of pernicious anemia that limited participants to older persons of Northern European descent. The National Institute for Health is currently calling for grant applications for research investigating why prostate cancer occurs with greater frequency in white

preme Court has stated: "Courts have stressed the importance of avoiding second-guessing of legitimate academic judgments. This Court itself has cautioned that 'judges ... asked to review the substance of a genuinely academic decision ... should show great respect for the faculty's professional judgment.'" *University of Penn. v. EEOC*, 493 U.S. 182, 199, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) (internal quotation marks and citation omitted).

Based on the evidence in the record, we agree with the district court's determination that UES's use of race/ethnicity in its admissions process is narrowly tailored to achieve the necessary laboratory environment.

## V.

In short, UES is a research-oriented institution dedicated to developing effective techniques for use in urban public schools-a project that benefits public school children throughout the state. California has a compelling interest in providing effective education to its diverse, multi-ethnic, public school population. UES's use of race/ethnicity in its admissions process is narrowly tailored to achieve the necessary laboratory environment to produce research results which can be used to improve the education of California's ethnically diverse urban public school population.

AFFIRMED.

BEEZER, Circuit Judge, Dissenting:

Keeley Tatsuyo Hunter appeals the district court's determination that the use of a racially classified admissions procedure at the Corrine A. Seeds University Elementary School ("UES") does not violate the Equal Protection Clause of the Fourteenth Amendment.

and black men than in Hispanic and Asian men.

1. Appellees characterize UES as "a controlled laboratory for educational researchers, akin to the laboratories used by physical scientists."

I write separately to express my fundamental disagreement with the court's opinion. It contravenes the central purpose of the Equal Protection Clause: to purge racial classifications from public life. The opinion strays from our precedent and fails to take heed of the Supreme Court's repeated warnings against allowing the use of racial classifications in non-remedial contexts. More generally, the opinion reflects a disquieting renewed tolerance for the use of race in governmental decision-making.

## I

UES is a laboratory elementary school operated by the Graduate School of Education and Information Studies ("GSE & IS") at the University of California, Los Angeles ("UCLA"). Students at UES are research subjects.[1] UES's stated mission is to conduct research relevant to an urban educational experience, to work with teachers, communities and schools to disseminate that research and to foster a more effective education system primarily for urban elementary students. More specifically, as described in appellees' brief, UES is devoted to "[s]tudying how children learn and how their backgrounds and family experiences—including their racial and ethnic identities—impact on their educational experience." UES has a student population of approximately 460 children, ages 4 to 12, who attend pre-kindergarten through sixth grade classes.

The UES admissions committee is comprised of three UES teachers and two GSE & IS faculty members. In selecting students for each year's incoming class, the UES admissions committee does not use pre-selection interviews, achievement/ability testing or any other type of competitive criteria. However, the UES admissions committee explicitly considers, inter alia, every applicant's racial/ethnic identity.[2] It does so in an attempt to

2. An information brochure prepared by UES states: "As a school that is seeking and disseminating ways to improve the children's learning and social development, Seeds UES must have a population of children that is relevant to the student population in Califor-

obtain what it considers an adequate cross-sample of the general student population, thus maintaining the scientific credibility of its educational studies.[3]

In December 1994 Hunter, who is now eight years old, applied for admission into UES's 1995–1996 entering class for four-year-olds (the so-called Early Childhood, or "EC–1," Program). Six racial/ethnic categories were used for the 1995–1996 admissions cycle: African–American, Asian–American, Native American, Latino(a), Caucasian and Multi–Ethnic. In the section of the admissions application entitled "Child's Ethnic Identity," Hunter identified herself as "Asian–American (specify): Japanese" and "Caucasian."[4] Hunter was one of 215 applicants for admission to UES's EC–1 program, 46 of whom were admitted. On March 11, 1995, Hunter was notified that she had been denied admission.

The UES admissions procedure for the 1995–1996 school year operated as follows:

First, the 20 siblings of current UES students who applied for admission were identified and admitted;

Second, the UES admissions committee determined a specific number of each racial/ethnic group to be admitted;

Third, dominant Spanish-speaking applicants were identified and a number of them were admitted;

Fourth, applicants from each self-identified racial/ethnic group were chosen at random to create a shorter list of potential admitees;

Fifth, from the children randomly selected within each racial/ethnic category, further sorting was done to ensure a reasonable gender balance and to distribute the admitted children among income groups;

Finally, a number of children were specially selected by the Dean of the GSE & IS (so-called "Dean's Admits") and substituted for randomly-selected children of the same gender, racial/ethnic identity and income group.[5]

Hunter brought suit on May 17, 1995 against the Regents of the University of California ("Regents") under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and against Theodore R. Mitchell, Dean of the GSE & IS and Vice Chancellor of Academic Planning and Budget at UCLA, under 42 U.S.C. § 1983. Hunter claimed that UES's utilization of racial quotas in denying her admission to UES's 1995–1996 EC–1 entering class violated the Equal Protection Clause of the Fourteenth Amendment. Following a two-day bench trial, the district court held that appellees' use of a racially classified admissions procedure is constitutional. In particular, the district court held that the use of racial and ethnic identity criteria in UES's admission policy is narrowly tailored to serve a compelling governmental interest. This timely appeal followed.

## II

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is grounded on the principle that "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose insti-

---

nia. To achieve this, [GSE & IS] sets gender, ethnicity and family income population goals for the school."

3. A representative cross-sample is necessary, according to appellees, because "findings cannot be generalized beyond the population on which the research was conducted."

4. Hunter is one-quarter Japanese and three-quarters Caucasian.

5. The demographic racial breakdown, as self-reported, of the 215 children who applied for admission to UES's EC–1 program was as follows: 110 Caucasians (51.2%); 49 mixed-race (22.8%); 23 African–Americans (10.7%); 19 Asians (8.8%); and 14 Latinos (6.5%). The demographic racial breakdown, as self-reported, of the 46 admitted applicants was as follows: 18 Caucasians (39.1%); 8 mixed race (17.4%); 6 African–Americans (13%); 4 Asians (8.7%); and 10 Latinos (21.7%).

tutions are founded upon the doctrine of equality." *Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943); *see also Shaw v. Reno,* 509 U.S. 630, 643, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) *("Shaw I")* (racial distinctions "threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility"). The central purpose of the Equal Protection Clause is "to prevent the States from purposefully discriminating between individuals on the basis of race." *Shaw I,* 509 U.S. at 642, 113 S.Ct. 2816. It is meant to ensure that all persons will be treated "as individuals, not simply as components of a racial ... class." *Miller v. Johnson,* 515 U.S. 900, 911, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (internal quotation marks omitted). "[W]henever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 229–30, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

"[R]egardless of [the] purported motivation," *Coalition for Economic Equity v. Wilson,* 122 F.3d 692, 702 (9th Cir.1997), "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny." [6] *Adarand,* 515 U.S. at 227, 115 S.Ct. 2097; *see Coalition for Economic Equity,* 122 F.3d at 702 ("[a]ny governmental action that classifies persons by race is presumptively unconstitutional and subject to the most exacting judicial scrutiny"). "[S]uch classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests." *Adarand,* 515 U.S. at 227, 115 S.Ct. 2097. It is the government's burden to satisfy the de-

mands of this "extraordinary justification," *Coalition for Economic Equity,* 122 F.3d at 702. *See Adarand,* 515 U.S. at 224, 115 S.Ct. 2097 ("any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny").

### III

It is uncontroverted that the racially classified admissions procedure at UES treats individuals unequally. *Cf. Coalition For Economic Equity v. Wilson,* 122 F.3d 692, 707 (9th Cir.1997). The only issues on appeal are whether appellees have asserted a sufficiently compelling interest to do so, and whether their chosen means are narrowly tailored to serve that interest.

### A

Appellees assert two separate, but related, compelling governmental interests: (1) California's "interest in research on effective urban educational strategies and dissemination of new knowledge about educational practices" [7] and (2) California's "interest in promoting freedom of inquiry at the University of California." Appellees' Brief at 18, 41. Neither interest, whether considered singly or together, is sufficiently compelling to withstand strict scrutiny.

### 1

As the First Circuit recently noted in *Wessmann v. Gittens,* 160 F.3d 790, 795 (1st Cir.1998), "[t]he question of precisely what interests government may legitimately invoke to justify race-based classifications is largely unsettled." A few things, however, are certain. "A State's interest

---

**6.** Although appellants bring suit under Title VI, a racial classification is permissible under Title VI only where it satisfies the strict scrutiny standard applied under the Equal Protection Clause. *See Regents of the University of California v. Bakke,* 438 U.S. 265, 287, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (Powell,

J.); *id.* at 328, 98 S.Ct. 2733 (Brennan, White, Marshall, and Blackmun, JJ.).

**7.** Throughout this opinion, I will refer to this asserted interest with the shorthand "educational research."

in remedying the effects of past or present racial discrimination may in the proper case justify a government's use of racial distinctions." *Shaw v. Hunt,* 517 U.S. 899, 909, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996) ("*Shaw II*"). For that interest to constitute a compelling governmental interest, it must satisfy two conditions. First, the discrimination must be specific, identified discrimination. *See id.* Second, "the institution that makes the racial distinction must have had a 'strong basis in evidence' to conclude that remedial action was necessary...." *Id.* at 910, 116 S.Ct. 1894.

It is also certain that "a generalized assertion of past discrimination in a particular industry or region is not adequate" to justify a race-conscious remedial scheme. *See Shaw II,* 517 U.S. at 909, 116 S.Ct. 1894. Such a broadbrush justification "provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." *Id.* (internal quotation marks omitted). For like reasons, the "role model" theory [8] is unacceptable as a compelling governmental interest. Not only does such a theory lack any connection to "the kind of prior discrimination ... that would justify race-based relief," but also it "could be used to justify race-based decisionmaking essentially limitless in scope and duration." *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 497–98, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (plurality opinion) (internal quotation marks omitted). Unlike a race-based remedy that is specifically tied to the eradication of identified past discrimination, the role model theory "has no logical stopping point." *Wygant,* 476 U.S. at 275, 106 S.Ct. 1842 (plurality opinion). It would allow the government "to engage in discriminatory ... practices long past the point required by any legitimate remedial purpose." *Id.*

Beyond those few certainties, the caselaw is more opaque.[9] In *Croson,* a plurality of the Supreme Court held that racial classifications are justified *only* when used to remedy the effects of racial discrimination. *See Croson,* 488 U.S. at 493, 109 S.Ct. 706 (O'Connor, J., joined by Rehnquist, C.J., and White and Kennedy, JJ.) ("Classifications based on race carry a danger of stigmatic harm. Unless they are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility."). One year later, four members of the current Supreme Court reiterated this view: "We subject even racial classifications claimed to be remedial to strict scrutiny ... to ensure that the Government in fact employs any race-conscious measures to further this remedial interest [in redressing the effects of identified race discrimination] and employs them only when, and no more broadly than, the interest demands." *Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 611, 110 S.Ct. 2997, 111 L.Ed.2d 445 (1990) (O'Connor, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ., dissenting) (citing *Croson,* 488 U.S. at 493–95, 498–502, 109 S.Ct. 706 and *Wygant,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (plurality opinion)).

Six of our sister circuits have adopted this view and have definitively held that racial classifications may only be used for the purpose of remedying racial discrimination. *See Hopwood v. State of Texas,* 78 F.3d 932, 944 (5th Cir.1996); *Contractors Ass'n v. City of Philadelphia,* 91 F.3d 586, 596 (3d Cir.1996); *Aiken v. City of Memphis,* 37 F.3d 1155, 1162–63 (6th Cir.1994);

---

**8.** First seen in *Wygant v. Jackson Bd. of Ed.,* 476 U.S. 267, 274, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986), this theory holds that minority students are in need of "role models" to alleviate the effects of prior societal discrimination.

**9.** As Judge Wiener, concurring in *Hopwood v. State of Texas,* 78 F.3d 932 (5th Cir.1996), observed, "the Supreme Court [has] declined to define compelling interest or to tell us how to apply that term." *Id.* at 965 n. 19 (Wiener, J., concurring); *see also* Susan M. Maxwell, Note, Racial Classifications Under Strict Scrutiny: Policy Considerations and the Remedial–Plus Approach, 77 Tex. L.Rev. 259, 296 (1998) ("the Court's view on the constitutionality of nonremedial racial classifications remains ambiguous").

*In re Birmingham Reverse Discrimination Employment Litig.,* 20 F.3d 1525, 1544 (11th Cir.1994); *O'Donnell Construction Co. v. District of Columbia,* 963 F.2d 420, 424 (D.C.Cir.1992); *Podberesky v. Kirwan,* 956 F.2d 52, 56 (4th Cir.1992). *But see Wittmer v. Peters,* 87 F.3d 916, 919 (7th Cir.1996) (holding that effective operation of prison boot camps is compelling governmental interest). We have also clearly held that "[r]ace-based classifications must be reserved strictly for remedial settings." *Coral Constr. Co. v. King County,* 941 F.2d 910, 920 (9th Cir.1991) (citing *Croson,* 488 U.S. at 493, 524, 109 S.Ct. 706); *see also Monterey Mechanical Co. v. Wilson,* 125 F.3d 702, 714 (9th Cir. 1997). *But cf. Coalition for Economic Equity v. Wilson,* 122 F.3d 692, 708 (9th Cir.1997) ("The Equal Protection Clause ... prohibits [racial classifications] in all but the most compelling circumstances. [Racial classifications are] in most circumstances irrelevant and therefore prohibited [and] should be subject to detailed judicial inquiry to ensure that the personal right to equal protection of the laws has not been infringed.").

A majority of the Supreme Court has never accepted a non-remedial justification for a racial classification.[10] *See Metro,* 497 U.S. at 612, 110 S.Ct. 2997 (O'Connor, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ., dissenting) ("Modern equal protection doctrine has recognized only one [compelling governmental] interest [in using racial classifications]: remedying the effects of racial discrimination."). In fact, four members of the Court, dissenting in *Metro,* squarely rejected a non-remedial compelling governmental interest in "diversity of broadcast viewpoints."[11] *See id.* Two circuit courts have also specifically rejected the "diversity" justification.

*See Hopwood,* 78 F.3d at 948 ("the use of race to achieve a diverse student body ... simply cannot be a state interest compelling enough to meet the steep standard of strict scrutiny"); *Lutheran Church–Mo. Synod v. FCC,* 141 F.3d 344, 354 (D.C.Cir. 1998) (noting, in the employment context, that "[w]e do not think diversity can be elevated to the 'compelling' level, particularly when the Court has given every indication of wanting to cut back *Metro Broadcasting* "). Based on its review of the relevant Supreme Court caselaw, the *Hopwood* court even went so far as to state that "non-remedial state interests will never justify racial classifications." *Hopwood,* 78 F.3d at 944.

Justice O'Connor's dissenting opinion in *Metro* represented the view of four Justices. The majority opinion in *Metro* upheld the federal government's non-remedial interest in "diversity of broadcast viewpoints" only by applying intermediate scrutiny (which the Court believed appropriate for federal racial classifications). *Metro* has since been overruled, *see Adarand,* 515 U.S. at 225–27, 115 S.Ct. 2097, in part because its application of intermediate scrutiny to federal racial classifications was inconsistent with the strict scrutiny applied to state racial classifications. In overruling *Metro, Adarand* did not specifically address the question whether "diversity of broadcast viewpoints" could count as a compelling governmental interest under strict scrutiny. *See id.* at 258–59, 115 S.Ct. 2097 (Stevens, J., dissenting) ("the question is not remotely presented in this case"). Thus, the *Metro* dissent's thorough and thoughtful rejection of an asserted non-remedial governmental interest in "diversity" under strict scrutiny provides signif-

---

10. Justice Scalia has, however, offered one: "a social emergency rising to the level of imminent danger to life and limb—for example, a prison race riot, requiring temporary segregation of inmates." *Croson,* 488 U.S. at 521, 109 S.Ct. 706 (Scalia, J., concurring).

11. It bears noting that Justice Powell's oft-cited opinion in *Bakke,* which approved the

consideration of race as "one element in a range of factors a university may properly consider" in achieving diversity among its student body, *Bakke,* 438 U.S. at 314, 98 S.Ct. 2733, "garnered only his own vote and has never represented the view of a majority of the Court," *Hopwood,* 78 F.3d at 944.

icant guidance on the question whether UES's asserted interests in educational research and academic freedom constitute compelling governmental interests.[12]

The leitmotif of Justice O'Connor's dissent in *Metro* is best captured by the following: "Social scientists may debate how peoples' thoughts and behavior reflect their background, but the Constitution provides that the Government may .not allocate benefits and burdens among individuals based on the assumption that race or ethnicity determines how they act or think." *Metro*, 497 U.S. at 602, 110 S.Ct. 2997 (O'Connor, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ., dissenting). Racial classifications, "whether providing benefits to or burdening particular racial or ethnic groups," are inherently pernicious because "[t]hey endorse race-based reasoning and the conception of a Nation divided into racial blocs, thus contributing to an escalation of racial hostility and conflict." *Id.* at 603–04, 110 S.Ct. 2997. Such policies "may stigmatize those groups singled out for different treatment" and "may embody stereotypes that treat individuals as the product of their race...." *Id.* at 604, 110 S.Ct. 2997.

The majority in *Metro* found solace in their argument that "diversity" would only justify "benign" uses of race-conscious measures. *See Metro*, 497 U.S. at 563–65 & n. 12, 110 S.Ct. 2997. The dissenters found this cold comfort, noting that "[t]he Court's emphasis on 'benign racial classifications' suggests confidence in its ability to distinguish good from harmful governmental uses of racial criteria. History should teach greater humility." *Id.* at 609, 110 S.Ct. 2997 (O'Connor, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ., dissenting). "Divorced from any remedial purpose and otherwise undefined, 'benign' means only what shifting fashions and changing politics deem acceptable." *Id.* at 615, 110 S.Ct. 2997. Thus, "racial distinctions might be directed expressly or in

practice at any racial or ethnic group" depending on "the preference of the moment." *Id.* at 610, 110 S.Ct. 2997.

It is precisely because racial classifications are "potentially so harmful to the entire body politic," *id.* at 604, 110 S.Ct. 2997 (internal quotation marks omitted), that the Supreme Court has only tolerated them in carefully defined remedial contexts. *See id.* at 612, 110 S.Ct. 2997; *Wygant*, 476 U.S. at 275, 106 S.Ct. 1842 (plurality opinion) (noting "the Court's focus on prior discrimination as the justification for, and the limitation on, a State's adoption of race-based remedies"). A non-remedial "interest in increasing the diversity of broadcast viewpoints is clearly not a compelling interest. It is simply too amorphous, too insubstantial, and too unrelated to any legitimate basis for employing racial classifications." *Metro*, 497 U.S. at 612, 110 S.Ct. 2997 (O'Connor, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ., dissenting).

Justice O'Connor's dissenting opinion excoriated the majority for "too casually extend[ing] the justifications that might support racial classifications, beyond that of remedying past discrimination." *Id.* at 613, 110 S.Ct. 2997. Justice O'Connor's opinion characterized "diversity" as "certainly insufficiently weighty to justify tolerance" of government-sponsored racial distinctions; indeed, to accept "diversity" as a justification would be to "trivialize[ ] the constitutional command to guard against such discrimination." *Id.* Of particular concern was the possibility that, "[l]ike the vague assertion of societal discrimination, a claim of insufficiently diverse broadcasting viewpoints might be used to justify ... unconstrained racial preferences ... [and] would support indefinite use of racial classifications." *Id.* at 614, 110 S.Ct. 2997. Justice O'Connor's discussion of "diversity" as a possible com-

---

12. Like UES in the case at bar, the FCC in *Metro* "concede[d] that its policies embodied no remedial purpose." *Metro*, 497 U.S. at 611, 110 S.Ct. 2997 (O'Connor, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ., dissenting).

pelling governmental interest concluded with a stern admonition:

> We should not accept as adequate for equal protection purposes an interest unrelated to race, yet capable of supporting measures so difficult to distinguish from proscribed discrimination. The remedial interest may support race classifications because that interest is necessarily related to past racial discrimination; yet the interest in diversity of viewpoints provides no legitimate, much less important, reason to employ race classifications apart from generalizations impermissibly equating race with thoughts and behavior.

*Id.* at 615, 110 S.Ct. 2997.

The same fear expressed in Justice O'Connor's opinion that "diversity" could be used to justify the indefinite use of racial classifications explains the Supreme Court's requirement that even remedial race-conscious measures be supported by a "specific and verifiable," *id.* at 613, 110 S.Ct. 2997, interest in eradicating racial discrimination. *See Shaw II*, 517 U.S. at 909, 116 S.Ct. 1894. The Court requires such showings to ensure that racial classifications will have "only limited and carefully defined uses." *Metro*, 497 U.S. at 613, 110 S.Ct. 2997 (O'Connor, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ., dissenting). For example, discussing Justice Powell's opinion in *Bakke*, the Court in *Croson* highlighted the contrast between the "focused" goal of remedying "specific instances of racial discrimination" and the comparatively "amorphous concept of injury" inherent in "societal discrimination" that "may be ageless in its reach into the past." *Croson*, 488 U.S. at 496–97, 109 S.Ct. 706 (plurality opinion) (internal quotation marks omitted). The idea of "societal discrimination" "does little to define the scope of any injury ... [and] could justify a preference of any size or duration." *Id.* at 505, 109 S.Ct. 706. Likewise in *Wygant*, the Court rejected the asserted interest in providing minority role models to redress societal discrimination because such a rationale would allow remedies "timeless in their ability to affect the fu-

ture." *Wygant*, 476 U.S. at 276, 106 S.Ct. 1842 (plurality opinion).

To prevent such an unbridled use of racial classifications, the Court has imposed rigorous evidentiary safeguards: any governmental entity endeavoring to classify by race must point to specific, identified instances of past or present discrimination, *Shaw II*, 517 U.S. at 909, 116 S.Ct. 1894, for which that governmental entity has been either actively or passively responsible, *Croson*, 488 U.S. at 482–84, 490–91, 109 S.Ct. 706; and that governmental entity must come forward with "a strong basis in evidence for its conclusion that remedial action was necessary." *Wygant*, 476 U.S. at 277, 106 S.Ct. 1842 (plurality opinion); *Bakke*, 438 U.S. at 308–09, 98 S.Ct. 2733 (Powell, J.) ("findings of constitutional or statutory violations" necessary to justify a racial classification).

> Proper findings in this regard are necessary to define both the scope of the injury and the extent of the remedy necessary to cure its effects. Such findings also serve to assure all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself. Absent such findings, there is a danger that a racial classification is merely the product of unthinking stereotypes or a form of racial politics.

*Croson*, 488 U.S. at 510, 109 S.Ct. 706 (plurality opinion).

### 2

I recognize that the great majority of equal protection jurisprudence has been formulated in the context of challenges to affirmative action programs of one stripe or another. The case at bar is not an affirmative action program; indeed, as appellees put it, the admissions procedures at UES "are not remedial in purpose and are not intended either to enhance the educational opportunities of disadvantaged children admitted to UES or to improve the general educational experience at UES

by promoting classroom diversity." Students are selected in fixed numbers according to race or ethnicity only to serve as subjects for educational research.

Let us not forget, however, the fundamental purpose of the Equal Protection Clause of the Fourteenth Amendment: "to prevent the States from purposefully discriminating between individuals on the basis of race." *Shaw I*, 509 U.S. at 642, 113 S.Ct. 2816. In the face of such a powerful constitutional proscription, UES's novel justifications quickly wither. So "noxious," *Adarand*, 515 U.S. at 241, 115 S.Ct. 2097 (Thomas, J., concurring), so "odious," *Hirabayashi*, 320 U.S. at 100, 63 S.Ct. 1375, are racial classifications in our constitutional democracy, that four members of the current Supreme Court have held that they have absolutely no place except in the most narrowly defined remedial settings. *See Croson*, 488 U.S. at 493, 109 S.Ct. 706 (O'Connor, J., joined by Rehnquist, C.J., and White and Kennedy, JJ.); *id.* at 524, 109 S.Ct. 706 (Scalia, J., concurring). Another member of the Court, Justice Thomas, has written that "government-sponsored racial discrimination based on benign prejudice is just as noxious as discrimination inspired by malicious prejudice." [13] *Adarand*, 515 U.S. at 241, 115 S.Ct. 2097 (Thomas, J., concurring).[14] I find these opinions instructive, if not controlling.

Even if UES's asserted interests are examined as possible compelling governmental interests, it is evident that they suffer from the same defects that doomed the "role model" theory in *Wygant*, the "societal discrimination" justification in *Croson* and the "diversity" rationale in *Metro*. As a preliminary matter, I would emphasize that academic freedom, standing alone, is clearly too flimsy an interest to justify racial discrimination. *See Bakke*,

438 U.S. at 313–14, 98 S.Ct. 2733 (Powell, J.) (although academic freedom constitutes a "countervailing constitutional interest, ... constitutional limitations protecting individual rights may not be disregarded"). If "academic freedom" could justify a racial classification, *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), would still be the law of the land. Thus, "academic freedom" will be considered only as an interest that might buttress UES's alternative claimed interest in educational research.

The district court held that "the defendants' interest in operating a research-oriented elementary school is compelling." I cannot agree. The "Supreme Court's decisions in *Croson* and *Adarand* indicate quite plainly that a majority of the Justices are highly skeptical of racial preferences and believe that the Constitution imposes a heavy burden of justification on their use." *Wessmann*, 160 F.3d at 808. UES's asserted interest in "research on effective urban educational strategies and dissemination of new knowledge about educational practices," Appellees' Brief at 18, 41, cannot bear that burden.

Just like the "role model" theory in *Wygant*, an "educational research" rationale is "amorphous" and admits of "no logical stopping point." *Wygant*, 476 U.S. at 275–76, 106 S.Ct. 1842 (plurality opinion). Just like "the vague assertion of societal discrimination [in *Croson*, or the] claim of insufficiently diverse broadcasting viewpoints [in *Metro* ]," *Metro*, 497 U.S. at 614, 110 S.Ct. 2997 (O'Connor, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ., dissenting), a governmental interest in educational research "might be used to justify ... unconstrained racial preferences," *id.*, that are "timeless in their ability to affect the future," *Wygant*, 476 U.S.

**13.** Justice Thomas intolerance for racial classifications would presumably only yield in a situation where such classifications are unavoidably "necessary to eliminate [a State's] own maintenance of a system of unlawful racial classification," *Croson*, 488 U.S. at 526, 109 S.Ct. 706 (Scalia, J., concurring).

**14.** As noted above, seven circuit courts of appeal (including this circuit) have agreed that only the remediation of identified past discrimination can justify government-sponsored racial classifications.

at 276, 106 S.Ct. 1842 (plurality opinion). Its inherent "indefiniteness," *id.,* could easily "justify race-based decisionmaking essentially limitless in scope and duration." *Croson,* 488 U.S. at 498, 109 S.Ct. 706 (plurality opinion) (internal quotation marks omitted).

Because an "educational research" justification contains "no viable limiting principle," it "may be expanded beyond any reasonable limits." *Hopwood,* 78 F.3d at 950–51. Although this case arises in the unique setting of California's only publicly supported elementary laboratory school, one shudders at the uses to which an "educational research" justification might be put. The holding articulated in the opinion filed today provides no principled basis for limiting the use of racial classifications in the service of "educational research," nor even for restricting the type of state actors who may conduct such research. Every stratum of a state's public education system (whether formally designated a "laboratory school" or not) may now, in the name of "research on effective educational strategies,"[15] implement a racially classified admissions system. The sure result would be "a mosaic of shifting preferences based on inherently unmeasurable claims."[16] *Croson,* 488 U.S. at 506, 109 S.Ct. 706.

For example, the University of California at Davis Medical School might decide that its school would provide a valuable "research laboratory" site to examine whether a class made up of fixed percentages of members of various races and ethnicities would result in improved educational outcomes for those members. A local school board may determine that all of the elementary and secondary schools within its jurisdiction are now to be educational "laboratories" and that racial quotas in admissions will be utilized in order to guarantee the "research relevance" of its student population. The court's opinion betrays a disturbing tolerance for racial classifications, and a historically unjustified confidence in the ability of government to employ them for "benign" purposes. *See Plessy,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256; *see generally Fullilove v. Klutznick,* 448 U.S. 448, 486–87, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (Burger, C.J.) (plurality) ("The history of governmental tolerance of practices using racial or ethnic criteria for the purpose or with the effect of imposing an invidious discrimination must alert us to the deleterious effects of even benign racial or ethnic classifications when they stray from narrow remedial justifications.").

Appellees proffered governmental interest in educational research, even when

15. I deliberately omit the word "urban" from the articulation of UES's interest, as nothing in today's holding would prevent research into effective strategies for the education of any particular racial mix of children found in any particular geographical setting.

16. The Court in *Croson* expressed an unwillingness to accept a justification that lacked a specific link to identified discrimination because that "would be to open the door to competing claims for 'remedial relief' for every disadvantaged group.... Courts would be asked to evaluate the extent of the prejudice and consequent harm suffered by various minority groups. Those whose societal injury is thought to exceed some arbitrary level of tolerability then would be entitled to preferential classifications. We think such a result would be contrary to both the letter and spirit of a constitutional provision whose central command is equality." *Croson,* 488 U.S. at 505–06, 109 S.Ct. 706 (internal quotation marks and citation omitted). Likewise under the holding in the opinion filed today. Courts will now be thrust into the unseemly position of having to determine which "research" projects are sufficiently genuine and worthy to justify the use of racial classifications. A look back at our history belies this court's apparent faith in the judiciary's capacity to "distinguish good from harmful governmental uses of racial criteria." *Metro,* 497 U.S. at 609, 110 S.Ct. 2997 (O'Connor, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ., dissenting); *see also Wittmer,* 87 F.3d at 919 ("common sense undergirded the pernicious discrimination against blacks now universally regretted"); *cf. Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944); *Plessy,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256.

considered along with its claimed interest in academic freedom, is "certainly insufficiently weighty," *Metro*, 497 U.S. at 613, 110 S.Ct. 2997 (O'Connor, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ., dissenting), to justify a departure from the constitutional mandate of equal protection. It is "amorphous" and "indefinite[ ]" and, consequently, "overexpansive." *Wygant*, 476 U.S. at 275–76, 106 S.Ct. 1842 (plurality opinion). It also lacks any connection to the kind of past or present racial discrimination that might, under appropriate circumstances, justify a government's use of racial distinctions. *See Shaw II*, 517 U.S. at 909, 116 S.Ct. 1894; *Monterey Mechanical*, 125 F.3d at 714; *cf. Metro*, 497 U.S. at 613, 110 S.Ct. 2997 (O'Connor, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ., dissenting) (accepting non-remedial interest in "diversity" would "too casually extend[ ] the justifications that might support racial classifications, beyond that of remedying past discrimination"). I would reverse the district court's holding that appellees claimed "interest in operating a research-oriented elementary school is compelling," *Hunter v. Regents of the Univ. of Calif.*, 971 F.Supp. 1316, 1324 (C.D.Cal.1997).

## IV

"Under strict scrutiny the means chosen to accomplish the State's asserted purpose must be specifically and narrowly framed to accomplish that purpose." *Wygant*, 476 U.S. at 280, 106 S.Ct. 1842 (plurality opinion). This narrow tailoring requirement demands "the most exact connection between justification and classification." *Adarand*, 515 U.S. at 229, 115 S.Ct. 2097 (internal quotation marks omitted). In part, this serves to ensure "that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson*, 488 U.S. at 493, 109 S.Ct. 706 (plurality opinion).

We look to a number of factors to gauge whether a racial classification is narrowly tailored: "whether there was any consideration of the use of race-neutral means," *Adarand*, 515 U.S. at 237–38, 115 S.Ct. 2097, and the "efficacy of [those] alternative[s]," *United States v. Paradise*, 480 U.S. 149, 171, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (plurality opinion); whether the racial classification was adopted for the sake of "administrative convenience," *Croson*, 488 U.S. at 508, 109 S.Ct. 706; and whether the chosen means are underinclusive or overinclusive, *Metro*, 497 U.S. at 621, 110 S.Ct. 2997 (O'Connor, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ., dissenting).[17] UES's racially classified admissions procedure is not narrowly tailored.

### A

UES's race-based admissions policy lacks the "exact connection between justification and classification," *Adarand*, 515 U.S. at 229, 115 S.Ct. 2097 (internal quotation marks omitted), that narrow tailoring requires. Appellees appear to believe that a child's race and ethnicity is somehow linked to a distinct "learning style,"[18] and

---

17. Another important consideration of narrow tailoring, noted in *Adarand* in the context of a challenge to a remedial race-conscious program, is "whether the program [is] appropriately limited" in scope and duration "such that it will not last longer than the discriminatory effects it is designed to eliminate." *Adarand*, 515 U.S. at 238, 115 S.Ct. 2097 (internal quotation marks omitted). In this case, because appellees asserted interest in educational research is vague and amorphous, UES's admissions procedure, a fortiori, cannot be "appropriately limited" in scope and duration. *Cf. Croson*, 488 U.S. at 507, 109 S.Ct. 706 ("it is almost impossible to assess

whether the Richmond Plan is narrowly tailored to remedy prior discrimination since it is not linked to identified discrimination in any way").

18. According to Professor Stipek, one of appellees' expert witnesses at trial, "[e]thnicity is an important variable in research related to education because there is evidence that children with different ethnic backgrounds often have different learning styles, respond differently to the same instructional approaches and have different styles of interaction with the teacher."

that these supposed cognitive differences between the races call for study. However, none of appellees' evidence concretely demonstrates the existence of an ineluctable connection between any particular race/ethnicity and any particular "learning style." [19] *Cf. Wessmann,* 160 F.3d at 799 ("The School Committee has provided absolutely no competent evidence that the proportional representation promoted by the Policy is in any way tied to the vigorous exchange of ideas. . . ."). At best, record evidence shows only a *possible* connection. For example, Professor Deborah Stipek testified that "children with different ethnic backgrounds *often* have different learning styles." (emphasis supplied). Professor Geoffrey Saxe testified that "ethnic diversity of targeted populations is particularly important for studies involving intervention and assessment, where we can *expect* that there *may* be important differences in the way children make sense of interventions, assessment procedures, and in the nature of mathematics individuals use in their everyday practices." (emphasis supplied).

But strict scrutiny "requires a direct rather than approximate fit of means to ends." *Metro,* 497 U.S. at 620, 110 S.Ct. 2997 (O'Connor, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ., dissenting). For example, the four dissenting Justices in *Metro* heard, and condemned, the argument that an individual's "race will likely indicate that [that individual] possesses a distinct perspective." [20] *Id.* at

619, 110 S.Ct. 2997. They warned that "even if the . . . equation of race and . . . viewpoint has *some empirical basis,* equal protection principles prohibit the Government from relying upon that basis to employ racial classifications." *Id.* at 620, 110 S.Ct. 2997 (emphasis supplied); *cf. Los Angeles Dept. of Water and Power v. Manhart,* 435 U.S. 702, 709, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978) ("Practices that classify employees in terms of religion, race, or sex tend to preserve traditional assumptions about groups rather than thoughtful scrutiny of individuals.").

The dissenting opinion in *Metro* applies with full force in the instant case. Even *if* "some empirical basis" might support the existence of a causal relationship between race/ethnicity and a distinct "learning style," the Equal Protection Clause forbids relying on that basis to classify by race. "[E]ssential equal protection principles . . . prohibit racial generalizations." *Id.* at 619, 110 S.Ct. 2997; *see Shaw I,* 509 U.S. at 647, 113 S.Ct. 2816 (striking down racial gerrymander because "[i]t reinforces the perception that members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests, and will prefer the same candidates at the polls").

### B

"Among the various narrow tailoring requirements, there is no doubt that consid-

---

**19.** The district court did not make a specific finding on this discrete question. The closest it came was to make the undifferentiated statement that an ethnically diverse student population presents "issues and challenges [that] include[ ] limited language proficiency, different learning styles, involvement of parents from diverse cultures with different expectations and values and racial and ethnic conflict among families and children." *Hunter,* 971 F.Supp. at 1328–29. To the extent that this statement could be construed as containing a finding of fact that any particular race/ethnicity is inextricably linked to any particular "learning style," such a finding is, on this record, clearly erroneous. More broadly, the "premise that differences in race

. . . reflect real differences . . . is utterly irrational and repugnant to the principles of a free and democratic society." *Metro,* 497 U.S. at 618, 110 S.Ct. 2997 (O'Connor, J., joined by Rehnquist, C.J., and Scalia and Kennedy, JJ., dissenting) (internal quotation marks omitted).

**20.** It bears emphasis that, although the majority opinion in *Metro* accepted the approximate fit of means (the FCC's race-based preferential licensing policy) to ends (diversity of broadcast viewpoints), it did so only through the use of intermediate scrutiny. Strict scrutiny may well have led to a different majority opinion.

eration of race-neutral alternatives is among the most important." *Coral Constr.*, 941 F.2d at 922. Appellees fail to satisfy this requirement. Specifically, appellees neglected to undertake any consideration—let alone "serious, good faith consideration," *id.* at 923—of one obvious race-neutral alternative: the establishment of one or more additional laboratory elementary schools in areas of California where the demographic diversity would naturally produce applicant pools with any desired racial/ethnic mix. UES is currently California's only state-supported laboratory school and is necessarily limited to an applicant pool that is drawn from Westwood and its environs. But nothing limits California to only one laboratory school.[21]

Appellees only response is to cite *Coral Construction* for the proposition that they are not required to "exhaust every alternative, however irrational, costly, unreasonable, and unlikely to succeed." *Id.* at 923 (alteration omitted). However, *Coral Construction* teaches that a state must "exhaust race-neutral measures that the state is authorized to enact, and that have a reasonable possibility of being effective." *Id.* California certainly has the authority to authorize the establishment of new laboratory schools, and appellees have failed to carry their burden of showing that such an alternative would not "have a reasonable possibility of being effective."

Another reasonable race-neutral option would be for UES to conduct its research on "the ethnically diverse student popula-tion now present in the urban school community." *Hunter*, 971 F.Supp. at 1328. The district court held that appellees had demonstrated that "the race and ethnicity-oriented research conducted at UES could not otherwise be performed in the actual urban elementary schools" in California.[22] *Id.* at 1332. The district court erred in discounting "the efficacy of [this] alternative," *Paradise*, 480 U.S. at 171, 107 S.Ct. 1053 (plurality opinion). This race-neutral alternative clearly has a "reasonable possibility of being effective." *Coral Constr.*, 941 F.2d at 923.

The district court found that existing public elementary schools would not allow teachers and researchers to control such things as class size, age groupings or student-teacher ratios. *See Hunter*, 971 F.Supp. at 1332. This is hardly an insuperable barrier. Any public school policies or procedures that present a potential impediment to conducting research in the public schools could be modified or eliminated, as appropriate, by the Board of Education and/or the California legislature.[23]

The district court also found that ensuring necessary levels of parental involvement in, and cooperation with, research carried out in public schools would be difficult. *See id.* The district court cited Professor Harry Handler's testimony that "depending on voluntary participation by parents produces additional bias in the study being undertaken through the self-selection involved in volunteering. At

---

21. According to Mitchell, three other University of California campuses (i.e., San Diego, Santa Cruz and Irvine) are presently discussing plans to build their own research-oriented laboratory schools. He testified, however, that he "ha[d] no idea" whether the naturally occurring diversity around those campuses would produce a sufficiently diverse applicant pool to obviate the need for racial quotas. Mitchell also testified that he "ha[d] not undertaken to ask the question [whether] any of the other nine campuses of the University of California" outside of UCLA are sufficiently diverse to eliminate the need for racial quotas.

22. The district court's conclusion that this race-neutral alternative was unavailable presents a mixed question of law and fact that we review de novo. *See National Ass'n of Radiation Survivors v. Derwinski*, 994 F.2d 583, 587 (9th Cir.1993).

23. The California legislature has shown itself willing to support the establishment of nontraditional schools. For example, as appellant notes, the California legislature enacted the Charter Schools Act of 1992, Cal. Ed.Code §§ 47600, et seq., which authorized the creation of up to 100 charter schools to, inter alia, "[e]ncourage the use of different and innovative teaching methods," Cal. Ed.Code § 47601(c).

UES, in contrast, parents ... agree to participate in all of the types of activities." [24] Appellees produce no evidence, however, that the putative "bias" caused by self-selection in a public school context could not be substantially or totally eliminated by simply offering suitable incentives (e.g., tax credits or cash payments) to ensure that parents participate in any research as required.

The district court, referring to Professor Ronald Gallimore's testimony, found that "attrition of teachers and school support" [25] presented a significant obstacle to educational research in public schools. *Hunter*, 971 F.Supp. at 1332. At trial, Professor Stipek expressed a similar view, stating that "[a] laboratory school ... needs teachers who are experienced working with researchers and who understand and accept that their job responsibilities require them to collaborate with researchers, to try, experimentally, innovative practices, and to evaluate those new methods and practices." These practical concerns are not, however, insurmountable.

Appellees fail to demonstrate why public school teachers could not be provided with any requisite training and then induced, or even required through contract, to collaborate with UES researchers. Even if public school teachers could not be utilized, appellees offered no evidence showing that UES teachers and research teams, given appropriate support and authorization from the California legislature and/or the Board of Education, could not simply be placed at certain public schools as their research requires. Furthermore, the lack of public school "support" for educational research could easily be addressed through appropriate state legislation and/or changes in public school policy and operating procedure.

Finally, even if appellees' theory of racial reductionism were valid, there is no reason for UES not to eschew the use of race in its admissions procedure and instead to choose students based on their particular "learning style." A properly constructed test, or series of tests, could allow UES to identify children who display whatever "learning style" it wished to study "without resorting to stigmatizing and fractionalizing racial classifications," *Coral Constr.*, 941 F.2d at 923. Given this possibility of an individualized admissions method, the only plausible explanation for appellees' use of a race-based system "would seem to be simple administrative convenience," *Croson*, 488 U.S. at 508, 109 S.Ct. 706. That defense is unacceptable. Appellees' interest in avoiding the bureaucratic effort necessary to tailor UES's admissions procedure to race-neutral factors "cannot justify a rigid line drawn on the basis of a suspect classification." *Id.*

### C

Appellees' offer essentially six rationales to justify their reliance on race in the UES admissions process, namely: to ensure funding; [26] to study the race-specific "learning styles" of children; to publish the results of research; to disseminate the results of research; to train future researchers and teachers; and to meet the requirements of specific studies. These rationales cannot justify the racial quotas that UES employed. [27]

---

24. I note in passing that neither Professor Handler, nor any other of appellees' witnesses, explained how the "bias" resulting from the "self-selection" of public school parents differs from the bias resulting from the "self-selection" of UES parents who, as a condition of their childrens' enrollment, agree to participate in research projects as needed.

25. Professor Gallimore described this lack of "school support" as follows: "researchers can be asked to leave with no notice by a principal or superintendent even after years of investment and effort."

26. Professor Stipek testified, for example, that racial/ethnic diversity is necessary to secure funding from the National Institutes of Health, a "primary outside funding source for childhood education research."

27. UES admitted exactly 18 Caucasian (39.1%), 10 Latino (21.7%), 8 mixed-race (17.4%), 6 African–American (13%), and 4 Asian (8.7%) students. Although appellees' witnesses preferred to characterize these numbers as "general targets" or "general goals," rather than outright quotas, UES "ap-

The "funding" rationale is legally untenable, as "a State may not protect the public fisc by drawing an invidious distinction between classes of its citizens.". *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 263, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974). Further, as best one can discern, the rationales based on the race-based "learning styles" of children, the desire to publish and disseminate research results,[28] and the need to train future researchers and teachers, all appear to require only some general level of racial/ethnic diversity. Appellees' expert witnesses testified, for example, that: UES requires "a diversity *comparable in rough terms* to urban schools" (Professor Saxe) (emphasis supplied); "it is imperative that UES have a student population that is perceived and accepted as being *representative* of the population in the public schools" (Professor Handler) (emphasis supplied); UES needs "the *kind of diverse populations that challenge . . . schools all over the state* " (Professor Gallimore) (emphasis supplied). Professor Stipek, director of UES, testified that the required "diversity" at UES would need to include some unspecified "critical mass" of each significant ethnic group represented in the urban school population, but conceded that she could not "give specific percentages." Plainly, this need for some undefined level of racial/ethnic diversity at UES bears scant relation, let alone the constitutionally required "exact connection," *Adarand,* 515 U.S. at 229, 115 S.Ct. 2097 (internal quotation marks omitted), to the use of a racial/ethnic quota system.

The rationale premised on the need for racial/ethnic diversity in specific studies conducted at UES also lacks any kind of connection to the racial/ethnic quotas used. The only studies mentioned by appellees'
expert witnesses were a bilingual research project involving native Spanish and English speaking students, and an instructional program being developed on the Harlem Renaissance. The bilingual study only requires the selection of children based on their native language, and is therefore irrelevant to any purported need for racial/ethnic diversity or racial quotas. The Harlem Renaissance project is geared solely toward African–American students and it does not, even by its own terms, require any specific number of those students. Thus, it, too, lacks any connection to UES's asserted need for a set number of students from different racial/ethnic groups.

## D

Finally, UES's utilization of a mixed-race category is a "red flag[ ]" signaling that its admissions procedure "is not, as the Equal Protection Clause requires, narrowly tailored." *Monterey Mech.,* 125 F.3d at 714. Indeed, UES's racially classified admissions system is overinclusive. The theory underlying UES's research mission is, in important part, that a child's race/ethnicity is specifically tied to a distinct "learning style." But if this is true, the targeted selection of mixed-race children is incomprehensible—how could such a theory possibly require the selection of mixed-race students? Use of this puzzling category is compelling evidence that UES's admissions method is not narrowly tailored. *Cf. Croson,* 488 U.S. at 506, 109 S.Ct. 706 ("random inclusion of racial groups that . . . may never have suffered from discrimination . . . strongly impugns the city's claim of remedial motivation"); *Wygant,* 476 U.S. at 284 n. 13, 106 S.Ct. 1842 (plurality opinion) ("The Board's defi-

peared to be especially adept at meeting its yearly 'goals.' " *Hopwood,* 78 F.3d at 948 n. 36. UES did so, as Professor Stipek explained, by translating any "goal" into a "specific number" in the course of making admissions decisions.

28. The publication and dissemination rationales are based on the need to maintain credi-
bility among the academic and teaching communities. According to Professor Stipek, members of these communities would "question the relevance" of UES's research unless it had "a population of children and families that reflects the diversity of California's urban public schools."

nition of minority to include blacks, Orientals, American Indians, and persons of Spanish descent further illustrates the undifferentiated nature of the plan.") (citation omitted).

Appellees only attempted justification for the anomalous presence of a mixed-race category in UES's admission procedures came from Professor Stipek. She claimed that "many children identified in California statistics in a single ethnic category are in fact of mixed ethnicities," and noted that "researchers ... as well as government organizations ... are working on alternative strategies to collect ethnicity data that do not force individuals into single categories." Accordingly, Professor Stipek explained that it was "inappropriate" to require multi-ethnic applicants to choose just one racial/ethnic category. This explanation manifestly fails to explain how the theory of race-specific "learning styles" justifies the selection of mixed-race students. The use of a mixed-race category in UES's admissions procedure is simply irreconcilable with the "onerous 'narrowly tailored' requirement," *Wygant*, 476 U.S. at 294, 106 S.Ct. 1842 (O'Connor, J., concurring).

## V

I would reverse the judgment of the district court. UES's racially classified admissions procedure does not comport with the Equal Protection Clause of the Fourteenth Amendment. In my judgment, Hunter is "entitled to reapply under an admissions system that invokes none of the[ ] serious constitutional infirmities," *Hopwood*, 78 F.3d at 962, discussed in this opinion.

I respectfully dissent.