392 F.3d 367
 Katuria E. SMITH; Angela Rock; Michael Pyle, for themselves and all other similarly situated, Plaintiffs-Appellants,
v.
UNIVERSITY OF WASHINGTON, Law School; Madrid; Richard Kummert; Michael Townsend; Roland Hjorth, Defendants-Appellees.
 No. 02-35676.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 11, 2004.
 Filed December 20, 2004.
 
 COPYRIGHT MATERIAL OMITTED Michael Rosman and Hans F. Bader, Center for Individual Rights, Washington, D.C.; and Steven Hemmat, Seattle, WA, for the plaintiffs-appellants.
 Michael Madden, and Bruce W. Megard, Jr., Bennett, Bigelow & Leedom, P. S., Seattle, WA, for the defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington, Thomas S. Zilly, District Judge, Presiding. D.C. No. CV-97-00335-TSZ.
 Before: D.W. NELSON, KLEINFELD, and FISHER, Circuit Judges.
 FISHER, Circuit Judge:
 
 
 1
 Plaintiffs Katuria Smith, Angela Rock and Michael Pyle are white Washington residents who claim that the University of Washington Law School (the "Law School") rejected their applications because of the Law School's unconstitutional consideration of race and ethnicity as factors in its admissions program. They appeal the judgment the district court entered against them following a bench trial.
 
 
 2
 The question presented is a narrow one due in part to external events that have overtaken this particular litigation. First, the Supreme Court last year ratified our earlier holding in this case that educational diversity constitutes a compelling state interest. Smith v. Univ. of Wash. Law Sch., 233 F.3d 1188, 1200-01 (9th Cir.2000); see Grutter v. Bollinger, 539 U.S. 306, 325, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003); Gratz v. Bollinger, 539 U.S. 244, 268, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003). In addition, after plaintiffs filed this lawsuit, Washington residents approved a voter initiative in 1998 prohibiting the kind of race-based affirmative action plan at issue here, thereby mooting the plaintiffs' injunctive and declaratory claims, which the district court dismissed. See Smith, 233 F.3d at 1192, 1201. Thus, left for us to decide is whether the Law School's admissions program was narrowly tailored to meet the compelling interest of educational diversity during the three years in which the plaintiffs applied — 1994, 1995 and 1996 — in order to determine whether the plaintiffs might be entitled to damages.
 
 
 3
 In support of their claim that the Law School's admissions program was not narrowly tailored, the plaintiffs cite three specific aspects of the program during the relevant years: (1) a so-called "ethnicity substantiation letter" that the Law School sent only to some minority applicants; (2) that Asian Americans were given a plus; and (3) a large number of white applicants were referred to the Admissions Committee rather than being directly admitted by an administrator. We hold that none of these aspects of the Law School's affirmative action program undermines the district court's finding that the Law School narrowly tailored its consideration of race and ethnicity in order to meet the compelling interest of obtaining the educational benefits of diversity. Accordingly, we affirm the district court judgment in favor of the Law School.
 
 I.
 
 4
 We summarize below the district court's most relevant findings of fact. Although the plaintiffs appear to contest some of these findings, at least in part, they have not established that the findings are clearly erroneous.[1]
 
 
 5
 During each of the years in question, the Law School received about 2,000 applications for approximately 165 positions. The top 250 to 300 candidates based on an index score (a weighted tabulation of the applicant's undergraduate grade point average ("GPA") and Law School Admission Test ("LSAT") score) were considered "presumptive admits," whereas the remaining applicants were considered "presumptive denies."
 
 
 6
 All the presumptive admit applications were read by Kathy Swinehart, the Law School's admissions coordinator, who either admitted applicants or referred their applications to the Admissions Committee for further consideration. Sandra Madrid, assistant dean and liaison to the Admissions Committee, reviewed almost all the presumptive deny applications and could admit, deny or refer applicants to the Admissions Committee for further review. Professor Richard Kummert, the Admissions Committee chairman during the relevant times, oversaw Swinehart's and Madrid's decisions. After Kummert, Madrid and Swinehart completed their work, the Admissions Committee ranked the 250 to 300 or so applications that the trio had identified as requiring committee referral, and the committee's top picks were offered admission.
 
 
 7
 The Law School did not establish any racial quotas, targets or goals for admission or enrollment. Nor is there evidence that the Law School sought to exclude whites from consideration for seats offered to minority applicants or otherwise applied significantly disparate standards to applicants of different races. The Law School did, however, consider racial and ethnic origin, among many other diversity factors, as a "plus" in its admissions decisions. The amount of preference given to a candidate due to his or her race or ethnicity differed depending on his or her race or ethnicity, e.g., Asian American applicants were given a preference lesser in magnitude than that given to African American candidates.
 
 
 8
 Although race and ethnicity were the most significant factors in the admissions decisions next to the index score, non-racial diversity factors also played a substantial role in admissions decisions. These factors included cultural background, activities or accomplishments, career goals, life experiences (such as growing up in a disadvantaged or unusual environment or with a physical disability) or special talents. No attempt was made to define the weight that could be accorded to any diversity factor; the weight sometimes changed as the pool was reviewed. This consideration of non-racial diversity factors explains in part why the Law School admitted whites scoring at or below every index score level from which minorities were admitted, and why more whites were admitted than any other group in the group of applicants with index scores below the median for the entire applicant pool.
 
 
 Procedural History
 
 
 9
 The plaintiffs filed this action on March 5, 1997, alleging that the Law School had discriminated against them on the basis of race in violation of 42 U.S.C. §§ 1981, 1983 and 2000d. In 1998, Washington voters passed Initiative 200, precluding certain state actors from discriminating against, or granting preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity or national origin. See Wash. Rev.Code § 49.60.400. The district court on February 10, 1999, dismissed the plaintiffs' requests for declaratory and injunctive relief, as Initiative 200 rendered them moot. We affirmed on appeal, and also held that colleges and universities may consider race or ethnicity in admissions in furtherance of the compelling interest in educational diversity. Smith, 233 F.3d at 1197-1201. Accordingly, we remanded the case to the district court for a trial of the individual plaintiffs' claims for liability.
 
 
 10
 The district court conducted a bench trial from April 8 to 12, 2002, and issued its decision on June 5, 2002, finding for defendants on all claims. Judgment was entered on June 19, 2002. Plaintiffs timely appealed, but we deferred briefing until the Supreme Court decided Grutter and Gratz. We have jurisdiction under 28 U.S.C. § 1291.
 
 II.
 
 11
 The plaintiffs challenge the district court's conclusion that the Law School's admissions program was narrowly tailored to further its compelling interest in obtaining the educational benefits that flow from a diverse student body. The district court's findings of fact are reviewed for clear error. See Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1088 (9th Cir.2002). A district court's conclusions regarding the sufficiency of the facts in meeting strict scrutiny are reviewed de novo. Hunter v. Regents of the Univ. of Cal., 190 F.3d 1061, 1063 (9th Cir.1999).
 
 
 12
 Racial classifications imposed by government are subject to review under strict scrutiny and thus are constitutional only if they are narrowly tailored to further compelling government interests. Grutter, 539 U.S. at 326, 123 S.Ct. 2325. Context matters when reviewing race-based governmental action. Id. at 327, 123 S.Ct. 2325. "Not every decision influenced by race is equally objectionable and strict scrutiny is designed to provide a framework for carefully examining the importance and the sincerity of the reasons advanced by the governmental decisionmaker for the use of race in that particular context." Id. The Law School bears the burden of demonstrating that its consideration of race and ethnicity in its admissions decisions was narrowly tailored to serve a compelling interest. See Parents Involved in Comm. Schs. v. Seattle Sch. Dist. No. 1, 377 F.3d 949, 960-61, slip op. at 10002-03 (9th Cir.2004). In assessing whether the Law School has met this burden, however, we must assume that it acted in good faith in the absence of a showing to the contrary and defer to its educational judgments. See Grutter, 539 U.S. at 328-29, 123 S.Ct. 2325.
 
 
 13
 Because the Supreme Court has provided in Grutter an example of a narrowly tailored admissions program, we first turn to that opinion as establishing a template of what educational institutions should do and measure the Law School's program against that approved in Grutter. See Parents Involved, 377 F.3d at 962-64, slip op. at 10006-10 (discussing Grutter's compelling interest analysis); id. at 964-66, 968-69, at 10010-13, 10016-18 (discussing Grutter's narrow tailoring analysis).
 
 A. Grutter
 
 14
 The University of Michigan Law School ("UMLS") employed a "Harvard-type" admissions process, of the kind Justice Powell described approvingly in Regents of the University of California v. Bakke, 438 U.S. 265, 317-19, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.).[2] Admissions officials were required to evaluate each applicant based on all the information available in the file. Grutter, 539 U.S. at 315, 123 S.Ct. 2325. Admissions officials were to look at and beyond the GPA and LSAT scores, to so called "soft variables," such as the quality of the recommendations, the undergraduate institution and the applicant's essay. Id. The policy also provided that diversity contributions were entitled to "substantial weight," and that there were many possible bases for diversity admissions. Id. at 316, 123 S.Ct. 2325.
 
 
 15
 As part of its diversity admissions, UMLS sought to enroll a "critical mass" of underrepresented minority students — targeting African Americans, Hispanics and Native Americans — to ensure that students of these races had the ability to make unique contributions to the law school. Evidence was presented that membership in certain minority groups was "an extremely strong factor in the decision for acceptance," and that applicants from these minority groups were "given an extremely large allowance for admission." Id. at 320, 123 S.Ct. 2325. Race or ethnicity was not the predominant factor in the Law School's admissions calculus, however. Id.
 
 
 16
 The Supreme Court held that UMLS had established a compelling interest because "attaining a diverse student body is at the heart of [UMLS]'s proper institutional mission." Id. at 329, 123 S.Ct. 2325; see also Parents Involved, 377 F.3d at 964 ("Grutter plainly accepts that constitutionally compelling internal educational and external societal benefits flow from the presence of racial and ethnic diversity in educational institutions."). Justice O'Connor, writing for the majority, identified two primary benefits of a diverse student body. First, the educational experience itself is greatly enriched by having diverse members. A diverse student body "promotes cross-racial understanding"; "helps to break down racial stereotypes"; "enables [students] to better understand persons of different races"; results in a "livelier, more spirited, and simply more enlightening" classroom discussion; and "better prepares students for an increasingly diverse workforce and society." Id. at 330, 123 S.Ct. 2325 (internal quotation marks omitted). Second, the Court recognized that "[a]ccess to legal education (and thus the legal profession) must be inclusive of talented and qualified individuals of every race and ethnicity, so that all members of our heterogenous society may participate in the educational institutions that provide the training and education necessary to succeed in America." Id. at 332-33, 123 S.Ct. 2325. "Effective participation by members of all racial and ethnic groups in the civic life of our Nation is essential if the dream of one Nation, indivisible, is to be realized." Id. at 332, 123 S.Ct. 2325.
 
 
 17
 The Court also concluded that UMLS's attempt to enroll a critical mass of underrepresented minorities was proper because the "concept of a critical mass is defined by reference to the educational benefits that diversity is designed to produce." Id. at 330, 123 S.Ct. 2325. Notably, the need for a critical mass is not premised "on any belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue." Id. at 333, 123 S.Ct. 2325 (internal quotation marks omitted). Indeed, "diminishing the force of such stereotypes is both a crucial part of [UMLS]'s mission, and one that it cannot accomplish with only token numbers of minority students." Id.
 
 
 18
 Having held that UMLS had a compelling interest in obtaining a critical mass of underrepresented minority students in order to secure the benefits of a diverse student body, the Supreme Court then turned to the question at issue here — whether the means by which UMLS attempted to obtain a diverse student body were constitutional. In approving the UMLS program, the Supreme Court discussed five hallmarks of a narrowly tailored affirmative action plan: (1) the absence of quotas; (2) individualized consideration of applicants; (3) serious, good-faith consideration of race-neutral alternatives to the affirmative action program; (4) that no member of any racial group was unduly harmed; and (5) that the program had a sunset provision or some other end point. See id. at 335-43, 123 S.Ct. 2325. Compare Parents Involved, 377 F.3d at 968-69, slip op. at 10016-18 (deriving six "constraints" from Grutter and Gratz).[3]
 
 
 19
 The Supreme Court first concluded that UMLS's attempt to reach a critical mass of underrepresented minority students did not operate as a quota. Grutter, 539 U.S. at 335-36, 123 S.Ct. 2325. In addition, the varying percentages of underrepresented minority students, from 13.5 to 20.1 percent, indicated that UMLS did not employ a quota. Id. at 336, 123 S.Ct. 2325. The Court defined a quota as (1) reserving a fixed number or proportion of opportunities — which must be attained and cannot be exceeded — for certain minority groups; and (2) insulating individuals from comparison with all other candidates for the available seats. Id. at 335, 123 S.Ct. 2325. By contrast, a "permissible goal" requires only a good faith effort to come within a range demarcated by the goal and permits consideration of race or ethnicity as a "plus" factor in any given case while still ensuring that each candidate competes with qualified applicants of other races and ethnicities. Id.
 
 
 20
 The Supreme Court next approved of UMLS's "highly individualized, holistic review of each applicant's file, giving serious consideration to all the ways an applicant might contribute to a diverse educational environment." Grutter, 539 U.S. at 337, 123 S.Ct. 2325. It contrasted the admissions system found unconstitutional in Gratz, noting that UMLS "awards no mechanical, predetermined diversity `bonuses' based on race or ethnicity." Id. (citing Gratz, 539 U.S. at 271-72, 123 S.Ct. 2411). That UMLS "frequently accepts nonminority applicants with grades and test scores lower than underrepresented minority applicants" who are rejected "shows that [UMLS] seriously weighs many other diversity factors besides race that can make a real and dispositive difference." Id. at 338, 123 S.Ct. 2325.
 
 
 21
 For a third element, narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks." Grutter, 539 U.S. at 339, 123 S.Ct. 2325. It "does not require exhaustion of every conceivable race-neutral alternative," nor that a university "choose between maintaining a reputation for excellence or fulfilling a commitment to provide educational opportunities to members of all racial groups." Id. The Court rejected alternatives the plaintiffs had suggested — such as a lottery system or decreased emphasis on numbers — because they would "require a dramatic sacrifice of diversity, the academic quality of all admitted students, or both." Id. at 340, 123 S.Ct. 2325.
 
 
 22
 Narrow tailoring also requires that a race-conscious admissions program not unduly harm members of any racial group. Grutter, 539 U.S. at 341, 123 S.Ct. 2325. The Supreme Court concluded that UMLS's program did not unduly harm members of any racial group because it considered "all pertinent elements of diversity" and thus "can (and does) select nonminority applicants who have greater potential to enhance student body diversity over underrepresented minority applicants." Id. (internal quotation marks omitted).
 
 
 23
 Finally, race-conscious admissions programs must be limited in time, such as by sunset provisions or periodic reviews to determine whether the preferences remain necessary. Id. at 342-43, 123 S.Ct. 2325. The Court accepted UMLS's word that it would terminate its race-conscious admissions program as soon as practicable. Id. at 343, 123 S.Ct. 2325 (citing Bakke, 438 U.S. at 317-18, 98 S.Ct. 2733 (presuming good faith of university officials in the absence of a showing to the contrary)). Having determined that the UMLS admissions program met the five criteria discussed above, the Court held constitutional UMLS's "narrowly tailored use of race in admissions decisions to further a compelling interest in obtaining the educational benefits that flow from a diverse student body." Grutter, 539 U.S. at 343, 123 S.Ct. 2325.
 
 
 24
 In contrast to UMLS's constitutional program, the Court concluded that the University of Michigan's College of Literature, Science and the Arts ("LSA") admissions program was not narrowly tailored because it "automatically distributes 20 points, or one-fifth of the points needed to guarantee admission, to every single `underrepresented minority' applicant solely because of race." Gratz, 539 U.S. at 270, 123 S.Ct. 2411 (emphasis added). Justice O'Connor, in her concurring opinion, underscored the difference between the UMLS and LSA admissions programs. "The law school considers the various diversity qualifications of each applicant, including race, on a case-by-case basis," whereas the LSA "relies on the selection index to assign every underrepresented minority applicant the same, automatic 20-point bonus without consideration of the particular background, experiences, or qualities of each individual applicant," and the selection index score "by and large [ ] automatically determines the admissions decision for each applicant." Id. at 276-77, 123 S.Ct. 2411 (O'Connor, J., concurring) (emphasis in original). The policy thus precluded consideration of each applicant's individualized qualifications, including the contribution each individual's race or ethnic identity would make to the diversity of the student body.
 
 B. The Law School's Admissions Program
 
 25
 In light of the criteria the Supreme Court has now articulated, we hold that the district court correctly concluded that the Law School's admissions program during 1994-96 "was narrowly tailored to achieve the compelling state interest of educational diversity." Like UMLS in adopting the program described in Grutter, the Law School here acted in good faith to implement a Harvard-type admissions process of the kind Justice Powell described approvingly in Bakke, 438 U.S. at 317-19, 98 S.Ct. 2733, and did so consistent with the hallmarks described in Grutter.
 
 
 26
 The Law School did not establish quotas, targets or goals for admission or enrollment of minorities. Indeed, the two deans of the Law School during the relevant period testified that they did not direct the admissions staff to admit a certain number of minority applicants. Further, the percentage of minorities varied each year in a manner inconsistent with the existence of a quota.[4] See Grutter, 539 U.S. at 336, 123 S.Ct. 2325.
 
 
 27
 In addition, the Law School's review of applications demonstrates the sort of "highly individualized, holistic review of each applicant's file, giving serious consideration to all the ways an applicant might contribute to a diverse educational environment" approved of in Grutter, 539 U.S. at 337, 123 S.Ct. 2325. Applications were divided according to index score. Almost all the top applicants were given offers, unless Swinehart believed the applicant had less academic potential than other presumptive admits, in which case she referred the applicant to the Admissions Committee for further review. The rest of the applicants had to pass the scrutiny of Madrid, the committee or both. These applicants were measured against each other, taking into account all the ways that an applicant might contribute to a diverse educational environment, including that applicant's racial or ethnic minority status. In applying the admissions policy, the reviewers testified that they looked at the whole person for life experiences that most applicants did not possess, trying to imagine that person in the school and what contributions to class diversity they could make.
 
 
 28
 The Law School also accepted nonminority applicants with grades and test scores lower than underrepresented minority applicants who were rejected, thus showing that the Law School "seriously weigh[ed] many other diversity factors besides race that [could] make a real and dispositive difference." Grutter, 539 U.S. at 338, 123 S.Ct. 2325. The district court found that nonracial "diversity factors played an important role in the Law School's admissions decisions in all years for all applicants." The consideration of diversity factors other than race and ethnicity further suggests that the admissions program did not unduly harm members of any racial group. See Grutter, 539 U.S. at 341, 123 S.Ct. 2325. Finally, although the Law School program did not have a sunset provision, the residents of the state of Washington mooted any challenges to this aspect when they passed Initiative 200, prohibiting certain state actors, including the Law School, from considering race or ethnicity in administering state programs.
 
 
 29
 In sum, the Law School's admissions program comported with the criteria set forth in Grutter. Moreover, unlike the program found unconstitutional in Gratz, the racial and ethnic pluses here did not "ha[ve] the effect of making the factor of race decisive for virtually every minimally qualified underrepresented minority applicant." Gratz, 539 U.S. at 272, 123 S.Ct. 2411 (quotation marks and elipses omitted). Instead, the Law School's consideration of race and ethnicity was flexible, "consider[ing] the diversity qualifications of each applicant, including race [and ethnicity], on a case-by-case basis." Id. at 276, 123 S.Ct. 2411 (O'Connor, J., concurring).
 
 
 30
 The plaintiffs, however, attempt to differentiate the Law School's program from UMLS's, focusing on three discrete aspects of the admission process. Specifically, they complain that during one or more of the relevant years, the Law School (1) provided an opportunity to some minority applicants to supplement applications through a so-called "ethnicity substantiation letter"; (2) gave a slight "plus" to Asian American applicants; and (3) referred a high number of white applicants to the Admissions Committee. We address each of these practices in turn, but conclude that none of them is inconsistent with the Law School's effort to narrowly tailor its affirmative action program.
 
 1. The Ethnicity Substantiation Letter
 
 31
 Contrary to the plaintiffs' claim, the so-called "ethnicity substantiation letter," as it has been referred to in this lawsuit, supports rather than undermines the constitutionality of the Law School's program. As the district court properly concluded, the Law School used the letter to more narrowly tailor the awarding of a plus for an applicant's race or ethnicity by seeking more information about the role that race or ethnicity played in the applicant's life, rather than simply relying on the applicant's minority status as such. The Law School sent the letter to some applicants who identified themselves as racial or ethnic minorities on the front page of their applications. To help ascertain whether the applicant's race or ethnicity should be considered a plus factor, the letter asked the applicant to provide additional information on "family background (including country of origin), languages spoken, official or government status (for Native Americans), and cultural activities and associations." This was the only letter the school used to seek additional information. Madrid testified that replying to the letter did not guarantee admission; but if the applicant responded, Madrid considered the new information and, as with all applicants, admitted some, referred some to committee and denied others. When applicants did not respond, the file was reviewed as it had been received. In light of this evidence, the district court concluded:
 
 
 32
 The Law School further narrowed its use of race by using the ethnicity substantiation letter to better determine which minority students would fulfill the goal of creating a pool of students with diverse backgrounds. The ethnicity substantiation letter allowed the Law School to give preference to those minority students whose race had impacted their views and experiences rather than giving preference to students based on their race alone. Thus, the program was designed to be sufficiently flexible to give more weight to those minority candidates who had more to contribute to the diversity of the classroom.
 
 
 33
 The plaintiffs argue against this conclusion, first by noting Madrid's testimony that the Law School would examine the application "as is," without any supplementation, if a minority applicant chose not to respond to the Law School's request. They also point to two minority applicants who were sent an ethnicity substantiation letter and who were admitted despite a "perfunctory" response from one applicant and no response from the other. That these two applicants were admitted in the absence of a meaningful response to the ethnicity substantiation letter proves little, however. That their or other non-responsive applicants' chances of admission might have been even better had they responded does not mean that the letter was an inappropriate effort to obtain additional relevant information. Moreover, the history of the two applicants proves nothing about what happened to other minority applicants who either did or did not respond to the letter nor impeaches Madrid's testimony that there was no pattern to the responses to the ethnicity substantiation letter or the letter's effect on who was admitted.
 
 
 34
 The plaintiffs also complain that white candidates did not receive the same opportunity to supplement their applications. We reject the assumption that the Law School, in adopting a technique to obtain supplemental information about a class of applicants in order to narrowly tailor the category of those who warranted a racial-ethnic diversity plus, had to apply that technique to all applicants.[5] There was no need to seek further substantiation from nonminority applicants who could not receive such a plus. Moreover, this selective inquiry did not unduly harm white applicants. The Law School directed all applicants to write a 700-word essay addressing their potential contributions to diversity.[6] [ER 180, 2165.] The record also indicates that white applicants could supplement their files on their own initiative.[7]
 
 
 35
 Assuming the good faith of the Law School in the absence of evidence to the contrary, see Grutter, 539 U.S. at 329, 123 S.Ct. 2325, we agree with the district court that the Law School properly sought to provide meaningful racial or ethnic pluses by seeking more information about minority candidates' backgrounds, thereby helping to narrowly tailor its program. In so doing, the school avoided awarding the type of automatic, decisive bonus that Gratz found unconstitutional. Gratz, 539 U.S. at 271-72, 123 S.Ct. 2411.
 
 2. The Asian American Plus
 
 36
 The plaintiffs suggest that Asian Americans, who were given a slight plus for racial diversity, should not have been given a plus at all because the Law School could have attracted what the plaintiffs deem a "critical mass" of Asian American students without a preference.[8] With the plus, Asian Americans constituted 18 percent of admitted applicants in 1994 and 14 percent in 1995 and 1996. Asian Americans would have constituted approximately 7 to 9 percent of the class without any racial or ethnic diversity factor.
 
 
 37
 This argument suffers from several problems. As an initial matter, it assumes that the category "Asian American" is homogenous. In reality, applicants whose families or who themselves originated from the Philippines, Viet Nam, Cambodia, Taiwan and the People's Republic of China — to name a few countries of origin from which the Law School specifically sought applicants — have different cultures, backgrounds and languages, and thus would bring different experiences to the educational environment. The Law School, with its preeminent Asian law program, was particularly interested in achieving such diversity among its Asian American students. This "educational judgment that such diversity is essential to its educational mission is one to which we defer." Grutter, 539 U.S. at 328, 123 S.Ct. 2325. As the Supreme Court observed, "the Law School's concept of critical mass is defined by reference to the educational benefits that diversity is designed to produce." Id. at 330, 123 S.Ct. 2325.[9]
 
 
 38
 In any event, assuming that Asian Americans should be treated as a homogenous group for the purposes of defining a critical mass, the plaintiffs have not provided any support for their theory that a critical mass is achieved whenever a particular group comprises 7 to 9 percent of the student body. Grutter did not establish such a cap. The Court cited testimony that "there is no number, percentage, or range of numbers or percentages that constitute critical mass." Id. at 318, 123 S.Ct. 2325. It also noted that UMLS's "interest is not simply to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin." Id. at 329, 123 S.Ct. 2325 (internal quotation marks omitted). Indeed, defining critical mass in terms of specific percentages "would amount to outright racial balancing, which is patently unconstitutional." Id. at 330, 123 S.Ct. 2325; see also Smith, 233 F.3d at 1197 ("Pure (or, if you will, impure) percentages used for their own sake are not proper.").[10]
 
 
 39
 We also note that relying on percentages to define a critical mass may be distortive, particularly when dealing with small numbers. Here, for instance, 7 to 9 percent of the Law School's 170-person class would be approximately 12 to 15 students.[11] By contrast, 7 to 9 percent of UMLS's 350-person class would be approximately 25 to 32 students. Although the percentages are the same, the difference in actual numbers — 12 to 15 as opposed to 25 to 32 — may be more important when considering that the goal of a critical mass is to provide for meaningful numbers, or meaningful representation, such that minority students are encouraged to participate in the classroom and not feel isolated. See Grutter, 539 U.S. at 318, 123 S.Ct. 2325; Bakke, 438 U.S. at 323, 98 S.Ct. 2733 (opinion of Powell, J.) ("[Ten] or 20 black students could not begin to bring to their classmates and to each other the variety of points of view, backgrounds and experiences of blacks in the United States.").
 
 
 40
 In sum, the Law School program was not unconstitutional simply because Asian Americans might have comprised 7 to 9 percent of the class in the relevant years in the absence of a racial or ethnic plus. Grutter explicitly refrained from setting a cap on what could constitute a critical mass, and we defer to the Law School's educational decision to award a racial or ethnic plus to Asian Americans in order to enroll a sufficiently large and diverse group of Asian Americans.
 
 
 41
 3. Referral of Some White Applicants to the Admissions Committee
 
 
 42
 The plaintiffs contend that the Law School created "separate tracks" for white and minority applicants, pointing primarily to the referral in 1994 of white applicants with index scores of 195 and 196 to the Admissions Committee but also to the larger proportion of white applicants referred to the committee rather than directly admitted over all the relevant years. We first address the referral process followed in 1994.
 
 
 43
 a. The Referral of White Applicants with 195 and 196 Index Scores to the Admissions Committee in 1994
 
 
 44
 In 1994, the Law School drew the line between "presumptive admits" and "presumptive denies" at 197 and above for the former and 194 and below for the latter, with applicants scoring 195-196 considered a "discretionary" group. Madrid was responsible for initially reviewing the presumptive denies and could admit, deny or refer applicants to the Admission committee for further review.
 
 
 45
 The entire discretionary group — which consisted of 158 applicants, 136 of whom were white — was supposed to be sent to the Admissions Committee without any review by Madrid, as part of the Law School's efforts to ensure that the committee would have approximately 300 applications to assess. Madrid pulled out the 22 applications from minority applicants, however, in order to make an expedited, albeit not necessarily favorable decision on these strong minority applicants in order "to actively recruit those candidates" who were admitted. She admitted 18, referred three to the Admissions Committee and denied one.
 
 
 46
 The district court noted that "this separate treatment of the minority applicants with an index score of 195-196" was "troublesome on it face," but found that the Law School provided a reasonable explanation for doing so and that the separate review did not interfere with the Law School's ability to provide appropriate consideration of the white applicants. First, the reason for not including the 22 minority files with the 136 applications reserved for committee review was that the Law School wanted to "mak[e] an early decision on minority candidates who were extremely well qualified based solely on their high index scores." Kummert explained that:
 
 
 47
 Our purpose there was to acknowledge the fact that for persons of color these qualifications are very rare throughout the general population applying to law school, that if we are to have a serious opportunity of trying to have them actually enroll at the law school that we had to try to communicate our eagerness by promptly admitting them and therefore not wait through the process basically of the group of applications that would come out of the admissions committee. It would tend to be about a month later.
 
 
 48
 As it later developed, the school's accelerated review strategy did not succeed, because only two of the admitted minority applicants with index scores of 195 and 196 accepted. Thus, the school abandoned the concept of a special discretionary group after 1994. In 1995 and 1996, Madrid reviewed all applications in the presumptive deny category, relying on her ability to act with alacrity on any applications when she thought speed was necessary.
 
 
 49
 Second, the 136 applicants Madrid referred directly to the Admissions Committee received a thorough, individualized consideration by the committee, even though Madrid did not herself provide a first review of those files. Indeed, the percentage of white applicants with 195-196 index scores who were admitted in 1994 as a result of committee review (29%) was approximately the same in all other years when Madrid reviewed the files initially (28%). In Madrid's review of the 22 minority applicants in the 195-196 group, she assessed them not in isolation, but only in conjunction with the more than 2,000 other white and minority presumptive denies in the 194 and below range.
 
 
 50
 We accordingly find no merit in the plaintiffs' argument that separating and accelerating the review of the applications of minorities with relatively high index scores was unconstitutional. The Law School simply sought to achieve the compelling interest of diversity by taking steps to increase the prospects of actually enrolling qualified minority applicants rather than risk losing them to other law schools. Moreover, Grutter does not require that a single reviewer evaluate all files, just that all applicants receive an individualized review. Because the Law School subjected both white and minority applicants to the highly individualized and holistic review discussed previously, and did not use these separate procedures to set aside any seats for minority applicants or utilize quotas, we conclude that Madrid's processing of the discretionary 195-196 group did not make the 1994 admissions program unconstitutional.
 
 
 51
 b. The Referral of White Applicants With Index Scores of All Ranges to the Admissions Committee
 
 
 52
 Plaintiffs finally argue that the admissions program was unconstitutional because in each of the years 1994 through 1996 the Admissions Committee's pool of applicants resulting from Swinehart's and Madrid's referrals (as opposed to direct admissions) was consistently predominantly white. Over the three years, Swinehart — reviewing the presumptive admit category — referred 60 applicants to the committee, 57 of whom were white; she directly admitted 743 applicants, 646 of whom were white. In the same period, Madrid — reviewing the presumptive denies — referred 860 applicants, 782 of whom were white.[12] Of the applicants Madrid admitted directly, 76 of 415 were white.[13] Plaintiffs focus primarily on Madrid's referrals.
 
 
 53
 To begin with, the large number of white applicants in the Admissions Committee pool must be viewed in context: white applicants ranged from 69 to 74 percent of the total applicant pool from 1994 to 1996. Thus it is not surprising that the committee pool would be predominantly white. In any event, having examined Madrid's review and decision-making process, the district court found that race was never the sole determining factor in Madrid's decision to admit an applicant. The record supports this finding. As described previously, Madrid provided a thorough, individualistic review for all the presumptive denies as required by Grutter, comparing each applicant against the others for the qualities — including racial or ethnic pluses as well as nonracial diversity pluses — that they could bring to the Law School. None of her decisions to admit someone directly was based solely on race, nor did she keep track by race of the number of applicants admitted directly or referred to the Admissions Committee.
 
 
 54
 Additionally, the Law School put into place a system of checks and balances. Kummert oversaw Madrid's decisions and engaged her in debate when he believed Madrid had recommended admission for less academically promising applicants; any continuing disagreement resulted in the applicant's being referred to the committee. Those applications that were referred to the Admissions Committee received another highly individualistic review, with the benefit of three reviewers and a procedure by which the scores were re-calibrated where the scores were too disparate. No applicants — whether reviewed by Madrid only or by Madrid and the Admissions Committee — were "foreclosed from all consideration for [a] seat simply because [they] were not the right color or had the wrong surname"; instead each applicant's "qualifications would have been weighed fairly and competitively." Grutter, 539 U.S. at 341, 123 S.Ct. 2325 (quoting Bakke, 438 U.S. at 318, 98 S.Ct. 2733). In short, nonminority applicants were not unduly harmed by this system of review, and the number of white applicants referred to the Admissions Committee does not establish a constitutional violation.
 
 III.
 
 55
 In conclusion, the Law School's narrowly tailored use of race and ethnicity in admissions decisions during 1994-96 furthered its compelling interest in obtaining the educational benefits that flow from a diverse student body. The district court was therefore correct in entering judgment against the plaintiffs' damages claims. Because we conclude that the Law School's admissions program was narrowly tailored, we need not reach the plaintiffs' other arguments.[14]
 
 
 56
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The plaintiffs' arguments at times appear implicitly to challenge certain findings, but they have failed to make explicit their disagreements with any specific findingSee Armstrong v. Davis, 275 F.3d 849, 860 (9th Cir.2001) (requiring that party identify "specific errors" in findings of fact).
 
 
 [2]
 Justice Powell described a Harvard-type program, based on that of Harvard College, as follows:
 In such an admissions program, race or ethnic background may be deemed a "plus" in a particular applicant's file, yet it does not insulate the individual from comparison with all other candidates for the available seats.
 * * *
 This kind of program treats each applicant as an individual in the admissions process. The applicant who loses out on the last available seat to another candidate receiving a "plus" on the basis of ethnic background will not have been foreclosed from all consideration for that seat simply because he was not the right color or had the wrong surname. It would mean only that his combined qualifications, which may have included similar nonobjective factors, did not outweigh those of the other applicant. His qualifications would have been weighed fairly and competitively, and he would have no basis to complain of unequal treatment under the Fourteenth Amendment.
 438 U.S. at 317-18, 98 S.Ct. 2733.
 
 
 [3]
 The sixth "constraint" cited inParents Involved is that the "use of race must be neither mechanical nor conclusive," Parents Involved, 377 F.3d at 968; in other words, there can be "no policy, either de jure or de facto, of automatic acceptance or rejection based on any single `soft' variable." Grutter, 539 U.S. at 337, 123 S.Ct. 2325. This factor is subsumed within the requirement of individualized consideration of applicants. See id. (discussing the lack of such automatic acceptance or rejection in concluding that UMLS "engages in a highly individualized, holistic review of each applicant's file"); see also HARVARD UNIVERSITY CIVIL RIGHTS PROJECT, A JOINT STATEMENT OF CONSTITUTIONAL LAW SCHOLARS, REAFFIRMING DIVERSITY: A LEGAL ANALYSIS OF THE UNIVERSITY OF MICHIGAN AFFIRMATIVE ACTION CASES 8 (2003) (identifying five narrow tailoring inquiries under Grutter and Gratz) available at http://www.civilrightsproject.harvard.edu/ (last visited August 14, 2004).
 
 
 [4]
 The numbers ranged from a high of 38.5 percent of admittees and 43.3 percent of enrollees in 1994 to a low of 24.7 percent of admittees in 1998 and 24.4 percent of enrollees in 1996
 
 
 [5]
 Although the plaintiffs contend that the ethnicity substantiation letter was intended to obtain information about nonracial forms of diversity from minority applicants, the letter does not compel such a reading, and the district court, after hearing extensive testimony and weighing copious evidence, accepted the Law School's statement of its limited purpose
 
 
 [6]
 The application stated:
 Important academic objectives are furthered by classes comprised of students having talents and skills derived from diverse backgrounds. Identify in your own words factors such as racial or ethnic origin, cultural background, activities or accomplishments, career goals, living experiences, such as growing up in a disadvantaged or unusual environment or with a physical disability, or special talents that you believe would contribute to the diversity of the law school community. Please include a separate sheet and limit your response to 700 words.
 
 
 [7]
 The record includes an application where a white applicant who was placed on the wait list submitted "additional information which might be helpful as [the Law School] evaluate[d] the status of [her] application." She submitted a three-page letter describing her recent work as a teaching assistant and a one-page listing of scholastic honors she had received. This additional information apparently was made part of her file
 
 
 [8]
 We use the Law School's "Asian American" terminology, but note that this group included nationals of other, Asian countries as well as American nationals
 
 
 [9]
 The majority inGrutter addressed critical mass in terms of UMLS's "goal of attaining a critical mass of underrepresented minority students," 539 U.S. at 335, 123 S.Ct. 2325, rather than looking to whether UMLS had sought a critical mass of each group. See id. at 336, 123 S.Ct. 2325.
 
 
 [10]
 For the same reasons, we reject the plaintiffs' broader contention that the Law School failed to demonstrate "why the benefits of diversity required such a high proportion of the class to be racial and ethnic minorities." The combined total of the racial and ethnic minorities is well within the critical mass deemed acceptable inGrutter, where UMLS provided a plus only to African Americans, Native Americans and Hispanics. 539 U.S. at 316, 123 S.Ct. 2325.
 
 
 [11]
 We note that the Law School estimated that if race had been eliminated as a factor in admission, and if application and enrollment rates had remained the same, entering classes would have been 1 to 3 percent Hispanic (2 to 5 students), 0 to 2 percent African American (0 to 3 students), 0 to 1 percent Native American (0 to 2 students) and 0 to 1 percent Filipino (0 to 2 students)
 
 
 [12]
 These numbers include the 136 white applicants in the discretionary group automatically referred to the Admissions Committee in 1994
 
 
 [13]
 The plaintiffs also assert that in 1994 and 1995 African American and Filipino American applicants were never sent to the Admissions Committee, but instead admitted directly. They focus on the years 1994 and 1995 presumably because Filipino American and African American applicantswere sent to, and mostly rejected by, the committee in 1996, 1997 and 1998. Eleven Filipino Americans were referred to the committee from 1996 to 1998; just one was admitted. Eleven African Americans were sent in the same time period; two were admitted. Given the dearth of African Americans and Filipino Americans in the pool, the fact that none were referred to the committee in 1994 and 1995 is not evidence of a separate track for those particular minorities.
 
 
 [14]
 The district court's findings do not establish that any of the plaintiffs would have been admitted to the Law School but for the challenged policySee Texas v. Lesage, 528 U.S. 18, 120 S.Ct. 467, 145 L.Ed.2d 347 (1999).